Marc Randazza
CA Bar No. 269535
RANDAZZA LEGAL GROUP
10620 Southern Highlands Pkwy #110-454
Las Vegas, NV 89141
888-667-1113
305-437-7662 (fax)
MJR@Randazza.com

Attorney for Plaintiff,
LIBERTY MEDIA HOLDINGS, LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA, SAN DIEGO DIVISION

| | |
|---|---|
| LIBERTY MEDIA HOLDINGS, LLC<br><br>Plaintiff,<br><br>vs.<br><br>CARY TABORA AND SCHULYER WHETSTONE<br><br>Defendants | Case No. 11-CV-651-IEG-JMA<br><br>**FIRST AMENDED COMPLAINT**<br><br>**(1) DIRECT COPYRIGHT INFRINGEMENT – 17 U.S.C. § 501**<br>**(2) CONTRIBUTORY COPYRIGHT INFRINGEMENT**<br>**(3) VICARIOUS INFRINGEMENT**<br>**(4) NEGLIGENCE** |

Plaintiff, Liberty Media Holdings (hereinafter "Liberty" or the "Plaintiff") files this amended complaint for copyright infringement against Cary Tabora and introduces Schulyer Whetstone as a defendant.

## **I. INTRODUCTION**

1. Plaintiff is the registered owner of the copyright to a motion picture, "Corbin Fisher's Down on the Farm (hereinafter the "Motion Picture"). See ECF 1-1.

2. This is a copyright infringement case in which the Defendants played integral parts in a scheme to illegally pirate the Plaintiff's Motion Picture by using BitTorrent file transfer protocol.

3. Plaintiff's original complaint initially only named Cary Tabora (hereinafter "Tabora") as a defendant. However, after a period of time in which Tabora evaded service, the

1

Plaintiff was able to track him down and effect service. Once Tabora was served with the complaint, he contacted counsel for the Plaintiff. See Declaration of Marc Randazza (hereinafter Randazza Dec.) ¶ 3.

4.      During a series of phone calls with Plaintiff's counsel, Tabora claimed that his roommate, now identified as Schulyer Whetstone (hereinafter "Whetstone") was the party who illegally downloaded and subsequently distributed the Motion Picture. Randazza Dec. ¶ 4.

5.      In the process of throwing Whetstone under the bus, Tabora admitted that he had full knowledge that Whetstone regularly used Tabora's Internet connection for the illegal purpose of pirating copyrighted content, yet Tabora continued to permit Whetstone to use his Internet connection for these illegal purposes. See Randazza Dec. ¶¶ 4-5. In fact, Tabora stated emphatically, "I was negligent" in allowing Whetstone to use his Internet connection, given the fact that Tabora was aware of Whetstone's illegal conduct. Randazza Dec. ¶ 6.

6.      Plaintiff seeks redress for the infringement upon its exclusive rights in the Motion Picture, and for injunctive relief to stop Defendants from continuing to infringe upon Plaintiff's copyrighted works and/or taking other acts which have led to damage being inflicted upon the Plaintiff.

## II. JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over Plaintiff's claims for copyright infringement and related claims pursuant to 17 U.S.C. §§ 101, et. seq., and 28 U.S.C. §§ 1331 and 1338(a).

8.      This Court has personal jurisdiction over the defendants under the California long-arm statute, Cal. Civ. Pro. § 410.10.

9.      Defendant Tabora was a subscriber to the Plaintiff's Corbinfisher.com website. When Tabora subscribed to the site, Tabora agreed that jurisdiction and venue for any disputes between himself and the Plaintiff was proper in the Southern District of California. See corbinfisher.com, Terms and Conditions:

> 11.1.    The following Governing Law Provisions shall apply:
> 11.1.1. Governing Law – This Agreement and all matters arising out of, or
> otherwise relating to, this Agreement shall be governed by the laws of the State of
> California, excluding its conflict of law provisions. The sum of this paragraph is

that any and all disputes between the Parties must be, without exception, brought to court and litigated in San Diego County, California.

11.1.1.1. All parties to this Agreement agree that all actions or proceedings arising in connection with this Agreement or any services or business interactions between the parties that may be subject to this Agreement shall be tried and/or litigated exclusively in the state and federal courts located in San Diego County, California.

11.1.1.2. The parties agree to exclusive jurisdiction in, and only in, San Diego County, California.

11.1.1.3. The parties agree to exclusive venue in, and only in, San Diego County, California.

11.1.1.4. The parties additionally agree that this choice of venue and forum is mandatory and not permissive in nature, thereby precluding any possibility of litigation between the parties with respect to, or arising out of, this Agreement in a jurisdiction other than that specified in this paragraph.

11.1.1.5. All parties hereby waive any right to assert the doctrine of forum non-conveniens or similar doctrines, or to object to venue with respect to any proceeding brought in accordance with this paragraph or with respect to any dispute under this Agreement whatsoever.

11.1.1.6. All parties stipulate that the state and federal courts located in San Diego County, California shall have personal jurisdiction over them for the purpose of litigating any dispute, controversy, or proceeding arising out of (or related to) this Agreement and/or the relationship between the parties contemplated thereby.

10. Therefore, Tabora explicitly consented to and stipulated to this jurisdiction for the purposes of this kind of dispute. Accordingly, Tabora cannot credibly argue that jurisdiction is improperly asserted over him in this district.

11. Defendant Whetstone is properly subject to jurisdiction in this Court because he committed an intentional tort (namely willful copyright infringement), specifically aimed at the Plaintiff, which he knew was located in this jurisdiction; Whetstone expressly aimed his unlawful and harmful conduct at this jurisdiction.

12. Furthermore, on information and belief, Whetstone has infringed upon many additional original works of intellectual property, many of which are owned by California entities.

13. Whetstone's actual or constructive knowledge that the harm suffered by his intentional acts of copyright infringement would be felt in California is supported by the fact that each of the Plaintiff's motion pictures, including the Motion Picture at issue in this case, clearly discloses on its introductory title screen that the work is produced by a San Diego business. See Exhibit 1.

14. The Defendants engaged in an intentional tort (copyright infringement) committed against a California company, where the infringed upon material clearly stated that the Plaintiff was a California entity, therefore, Defendants knew full well that infringement upon the copyright in the Motion Picture would cause harm and damage in California.

15. On information and belief, Tabora was aware of, endorsed, and benefitted from Whetstone's infringement.

16. Tabora was aware of the fact that Whetstone used Tabora's internet connection to infringe upon the Plaintiff's copyrights, as well as the copyrights owned by many California entities and/or residents, including those owned by Plaintiff.

17. Therefore, even if Tabora were not a subscriber to the Plaintiff's website, and even if Tabora had not agreed to jurisdiction in this district, he would be subject to jurisdiction in this district under the California Long Arm statute as Tabora purposefully directed his activities toward the California intellectual property at issue. To any extent that he did not do so, as a contributory and/or vicarious infringer, he stands in the shoes of the direct infringer, Mr. Whetstone, who most certainly did so.

18. Plaintiff's claims arise out of the Defendants' conduct which gives rise to personal jurisdiction over Defendants. By taking the affirmative act of both downloading and uploading a known California company's intellectual property, which was clearly labeled as such, Defendants engaged in intentional acts aimed at this jurisdiction. As the Defendants knew or should have known (and only could not have known through willful blindness) that the copyright they infringed upon was California intellectual property, the Defendants expressly aimed their acts at a California company.

19. There was clearly foreseeable harm in this jurisdiction, and the Defendants' conduct caused harm that they knew or should have known was likely to be suffered in this jurisdiction.

20. It was a foreseeable consequence of the Defendants' actions that the Plaintiff would suffer harm to its profits, business reputation, and goodwill. It was foreseeable that these harms would be felt in this jurisdiction and venue.

## III.  THE PARTIES

### A.  The Plaintiff, Liberty Media Holdings, LLC

21. Liberty is a California LLC with a mailing address of 302 Washington Street, Suite 321, San Diego, CA 92103.

22. Liberty produces high-quality, adult-themed motion pictures, which it sells to adults only.

### B. Defendants Schulyer Whetstone and Cary Tabora

23. On information provided by Mr. Tabora (and belief), Defendants are roommates, who, at the time of the infringement, resided together within the same household in New York City, and who shared an Internet connection there.

24. However, Tabora is a Florida permanent resident, as his drivers' license lists a Davie, Florida address, his voter registration lists a Davie, Florida address, and all indications are that Tabora is only in New York temporarily while working toward a masters' degree.

25. According to voter registration records, Whetstone's permanent residence is in Gainesville, Florida.  According to driver's license records, Mr. Whetstone's permanent address is in Port St. Lucie, Florida.

26. Defendants used the I.P. address 68.175.79.147 on November 16, 2010 at 7:47:02 a.m. (UTC) to illegally republish and illegally distribute copies of the Plaintiff's copyrighted work, "Down on the Farm," to an unknown number of individuals over the Internet.

## IV.  COPYRIGHT AND BITTORRENT

27. BitTorrent is a peer-to-peer file sharing protocol used for distributing and sharing data on the Internet, including files containing digital versions of motion pictures.  Rather than downloading a file from a single source, the BitTorrent protocol allows users to join a "swarm," or group, of hosts to download and upload from each other simultaneously.  The process works as follows:

> a. First, users download a torrent file onto their computer.  This file contains a unique hash code known as the SHA-1 hash – which is a unique identifier generated by a mathematical algorithm developed by the National Security Agency.  This torrent file contains a "roadmap" to the IP addresses of other

users who are sharing the media file identified by the unique hash value, as well as specifics about the media file. The media file could be any large file, such as a digital motion picture or music file.

    b. Second, the user opens the torrent file with a BitTorrent program, also known as a BitTorrent "client" application, which is capable of reading the roadmap encoded in the torrent file. This client program, after reading the roadmap, connects "uploaders" of the file (i.e. those that are distributing the content) with "downloaders" of the file (i.e. those that are copying the content). During this process, the client reaches out to one or more "trackers" that are identified on the roadmap. A tracker is an Internet server application that records the IP addresses associated with users who are currently sharing any number of media files identified by their unique hash values and then directs a BitTorrent user's computer to other users who have the particular file each user is seeking to download.

28. For a BitTorrent user, this process is quite simple. When a BitTorrent user seeks to download a motion picture, he or she merely opens the appropriate torrent file, which may be found online on any number of torrent search engine websites, using a BitTorrent client application.

29. Because BitTorrent client software generally lacks the ability to search for torrents, end-users use search engines or other websites that contain indices of torrent files to find files being made available by other BitTorrent users. These torrent files do not contain audio or visual media, but instruct the user's BitTorrent client where to go and how to obtain the desired file.

30. The downloading user's BitTorrent client then extracts a list containing one or more tracker locations, which it then uses to connect to at least one tracker that will identify IP addresses where the file is available. Each IP address identifies an uploading user who is currently running a BitTorrent client on his or her computer and who is currently offering the desired motion picture file for download. The downloading user's BitTorrent software then

begins downloading the motion picture file without any further effort from the user, by communicating with the BitTorrent client programs running on the uploading users' computers.

31. The life cycle of a file shared using BitTorrent begins with just one individual – the initial propagator, sometimes called a "seed" user or "seeder." The initial propagator intentionally elects to share a file with a torrent swarm. The original file, in this case, contains Plaintiff's entire copyrighted work.

32. Other members of the swarm connect to the seed to download the file, wherein the download creates an exact digital copy of Plaintiff's copyrighted work on the downloaders' computers. As additional thieves request the same file, each additional thief joins the collective swarm, and each new thief receives the same or different pieces of the file from each other thief in the swarm who has already downloaded any part of the file. Eventually, once the initial propagator has distributed each piece of the file to at least one other thief, so that together the pieces downloaded by members of the swarm comprises the whole motion picture when reassembled, the initial propagator may leave the swarm, and the remaining thieves can still obtain a full copy of the motion picture by exchanging the pieces of the motion picture that each one has.

33. Files downloaded in this method are received in hundreds or even thousands of individual pieces. Each piece that is downloaded is immediately thereafter made available for distribution to other users seeking the same complete file. The effect of this technology makes every downloader also an uploader of the content. This means that every user who has a copy of the infringing material in a swarm may also be a source for later downloaders of that material.

34. In the BitTorrent world, there is honor among thieves. Those who merely download files, without publishing and sharing files, are derisively called "leechers."

35. Being a leecher is not only a negative due to the pejorative terminology, but leechers are also punished by the torrent swarm.

36. BitTorrent's protocol stalls the downloads of leechers, in an effort to preserve network speed for the more prolific copyright infringers. The sharing of files as users receive them, then, is inherent in BitTorrent's use for the protocol to be of any utility to the end user.

37. This distributed nature of BitTorrent leads to a rapid viral sharing of a file throughout the collective peer users. As more peers join the collective swarm, the frequency of successful downloads also increases. Because of the nature of BitTorrent protocol, any seed peer that has downloaded a file prior to the time that a subsequent peer downloads the same file is automatically a source for the subsequent peer, so long as that first peer is online at the time the subsequent peer requests download of the file from the swarm. Because of the nature of the collective swarm downloads as articulated above, every infringer is – and by necessity together – simultaneously both stealing the Plaintiff's copyrighted material and redistributing it.

38. Plaintiff has recorded Tabora's IP address being used to publish the Motion Picture via BitTorrent.

39. On information and belief, Whetstone and Tabora were either the initial propagators of the relevant swarm or they were early participants in it. This particular hash file has been traced to thousands of infringements and duplicate copies propagated over the Internet. Accordingly, the Defendants' actions were not mere copyright infringement on an individual scale, but were the cause of thousands upon thousands of lost sales and pirated copies of the Plaintiff's work being distributed world wide.

40. Plaintiff's Motion Picture is easily discernable as a professional work. Plaintiff created the works using professional performers, directors, cinematographers, lighting technicians, set designers and editors. Plaintiff created each work with professional-grade cameras, lighting, and editing equipment.

41. Each of Plaintiff's works is marked with Plaintiff's trademark (CORBIN FISHER®), a copyright notice, a warning that unauthorized copying is illegal and will be prosecuted, and a statement as required by 18 U.S.C. § 2257 that age verification records for all individuals appearing in the works are maintained at corporate offices in San Diego, California.

42. Defendants, without authorization, copied and distributed audiovisual works owned by and registered to Plaintiff in violation of 17 U.S.C. §§ 106(1) and (3).

## VI.  FIRST CAUSE OF ACTION
### (Direct Copyright Infringement 17 U.S.C. § 501 – Against Defendant Whetstone)

43. The Plaintiff re-alleges and incorporates by reference the allegations contained in each paragraph above.

44. Since Tabora has blamed Whetstone for the direct infringement, on information and belief, Whetstone is the direct infringer in this case. However, if Tabora's story is later found to be untrue, Plaintiff reserves the right to amend this complaint to name Tabora as the direct infringer.

45. Plaintiff is, and at all relevant times has been, the copyright owner of the copyrighted work infringed upon by all Defendants, "Down on the Farm." See ECF 1-1.

46. Among the exclusive rights granted to each Plaintiff under the Copyright Act are the exclusive rights to reproduce the Motion Picture and to distribute it − rights which Defendants maliciously and intentionally infringed upon.

47. Plaintiff is informed and believes, and on that basis alleges, that one of the Defendants without the permission or consent of Plaintiff, used, and continues to use the BitTorrent file transfer protocol to distribute the Motion Picture to the public, and/or make the Motion Picture available for distribution to others, including other BitTorrent users. In doing so, Defendant has violated Plaintiff's exclusive rights of reproduction and distribution. Defendant's actions constitute infringement of Plaintiff's copyrights and exclusive rights under the Copyright Act.

48. Plaintiff is informed and believes and on that basis alleges that the foregoing acts of infringement were willful and intentional.

49. As a result of Defendant's infringement of Plaintiff's copyrights and exclusive rights under the Copyright Act, Plaintiff is entitled to either actual or statutory damages pursuant to 17 U.S.C. § 504(c), and to its attorney fees pursuant to 17 U.S.C. § 505.

50. The conduct of Defendant is causing and will continue to cause Plaintiff great and irreparable injury. Such harm will continue unless the Defendant is enjoined from such conduct by this Honorable Court. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting Defendant from further infringing

Plaintiff's copyrights, and ordering Defendant to destroy all copies of any Motion Picture made in violation of Plaintiff's exclusive rights under the Copyright Act.

## VII.  SECOND CAUSE OF ACTION
### (Contributory Copyright Infringement – Against Defendants Whetstone and/or Tabora)

51. Plaintiff re-alleges and incorporates by reference the allegations contained in each paragraph above.

52. It is helpful to think of the process of "torrenting" in the context of a constructed puzzle.  In furtherance of sharing this puzzle, it is deconstructed into tiny pieces.  These pieces are then uploaded and distributed among one or more peers.  When an infringer seeks to download the original file, he downloads a torrent file containing information concerning where each of the distributed pieces of the file can be found, i.e., how to find and contact each peer.  Each torrent file that contains information about the same original file is contains the same "hash" value, which is a string of letters and numbers that uniquely identifies the original file that the torrent file may be used to locate and download.  This torrent file is capable of locating all the unique corresponding pieces that make up the original file (and any additional copies of each piece that may be available).  Once all the pieces are located and downloaded they are reconstructed back into the original order completing the entire original copyrighted file.

53. When users all possess the same infringing work with the same exact hash value (as in this case), it is because each infringer possesses an <u>exact</u> digital copy, containing the exact bits unique to that file, of the original work.  In essence, although hundred of users may be uploading the copyrighted work, you will receive only the exact parts of a singular upload, not a compilation of available pieces from various uploads.

54. The Defendants published the Plaintiff's copyrighted motion picture to the BitTorrent network.

55. BitTorrent users upload infringing works in concert in order to gain access and ability to download other infringing copyrighted works.

56. The Defendants knew of the infringement, were conscious of their own infringement, and the Defendants were conscious of the fact that multiple other persons downloaded the file containing the Plaintiff's Motion Picture.

57.	The infringement by other BitTorrent users could not have occurred but for the Defendant's participation in uploading the Plaintiffs protected work. As such, the Defendants participation in the infringing activities of others is substantial.

58.	The Defendants each profited from this contributory infringement by way of being granted access to a greater library of other infringing works, some of which belonged to the Plaintiff and some of which belonged to other copyright owners.

59.	Furthermore, Tabora profited from this contributory infringement by granting Whetstone access to his internet connection for (on information and belief) profit either in the form of goodwill, barter, or a contribution to the bill for the internet connection.

60.	Tabora had the right and ability to control Whetstone's access to the internet connection and declined to exercise that right and ability in order to stop Whetstone's activities, even though he was fully aware of the fact that Whetstone used the internet connection regularly to infringe upon the Plaintiff's copyrights and the copyrights of other parties.

61.	Tabora knew of the infringement, was conscious of Whetstone's infringing activities, and the infringement by Whetstone and other BitTorrent users could not have occurred but for Tabora's contribution to the scheme.

## VIII.  THIRD CAUSE OF ACTION
### (Vicarious Copyright Infringement – Against Defendants Whetstone and/or Tabora)

62.	Plaintiff re-alleges and incorporates by reference the allegations contained in each paragraph above.

63.	Without authorization, one of the Defendants uploaded and distributed Plaintiff's copyrighted works by and through the BitTorrent file transfer protocol.

64.	The BitTorrent file transfer protocol is used almost exclusively to locate, reproduce, and distribute infringing content.

65.	Plaintiff is informed and believes and based thereon alleges that the material made available by and through the BitTorrent file transfer protocol includes a substantial amount of obviously unauthorized material including, for example, first run feature films prior to DVD or even box office release.

66. In order to access and use the BitTorrent file transfer protocol, a user must first download special software called a BitTorrent client.

67. The center of the conspiracy is the scheme to traffic in infringing content. If authorities remove any of the BitTorrent trackers from service, the others may continue to operate.

68. The purpose of the BitTorrent file transfer protocol (i.e., for certain participants to identify themselves as a source for a file hash to one or more trackers and thereby facilitate the reproduction and distribution of infringing copies of copyrighted works between a network of coconspirators) is apparent to any user who downloads a BitTorrent client and uses the client for that purpose.

69. Once a user identifies and selects the infringing content he wants to download, he or she can then use the BitTorrent client to locate that file, or any portion thereof, on the computers of other users offering the file for distribution and then transfer the infringing file to his or her computer.

70. The transfer of infringing files cannot occur without the existence and assistance of the participant users, including the Defendants named herein, who supply the infringing content.

71. Plaintiff is informed and believes and based thereon alleges that each of the Defendants downloaded a BitTorrent client for the purpose of conspiring with other BitTorrent users to reproduce and distribute movies in violation of copyright laws.

72. Plaintiff is informed and believes and based thereon alleges that at the time the Defendants downloaded a BitTorrent client, he knew the client would provide access to infringing movies made available by other users and would allow the Defendant to provide infringing movies to other BitTorrent users.

73. Plaintiff is informed and believes, and based thereon alleges, that at the time the Defendants downloaded a BitTorrent client, he intended to access a network of other BitTorrent users for the purpose of reproducing and exchanging infringing copies of movies in violation of copyright laws.

74. Plaintiff is informed and believes, and based thereon alleges, that BitTorrent clients reward users for making content available to others by enabling faster download speeds for those who make content available.

75. In addition to the infringing files containing digital copies of Plaintiff's movies, each Defendant without authorization offered large amounts of infringing content belonging to other copyright holders for others to download, knowing the infringing nature of the content they offered.

76. Plaintiff is informed and believes and based thereon alleges that the Defendants without authorization offered large amounts of infringing content to others, knowing that other BitTorrent users would download the infringing content and further distribute it in exchange for still more infringing content.

77. Plaintiff is informed and believes, and based thereon alleges, that the Defendants distributed infringing movies in anticipation of receiving copies of infringing movies in return, including Plaintiff's copyrighted Motion Picture.

78. Each Defendant knew or should have known that the infringing content the Defendant downloaded to his computer came from the computers of other users, who made the content available to him or her, as well as others in the same network of BitTorrent users, in violation of copyright laws.

79. The Defendants understood the nature of the conspiracy to violate copyrights and agreed to join the conspiracy by downloading a BitTorrent client with the intention of using that BitTorrent client to knowingly download, reproduce, and distribute infringing files with coconspirators.

80. The Defendants engaged in an unlawful act in furtherance of the conspiracy when he, without authorization, used a BitTorrent client to download, reproduce, and distribute copies of Plaintiff's copyright registered works.

81. Defendants conspired with the other parties by agreeing to provide infringing reproductions of various copyright protected works, including Plaintiff's works, in exchange for infringing reproductions of other copyright protected works, including Plaintiff's works.

82. The Defendants took affirmative steps to advance the conspiracy by unlawfully and without authorization reproducing Plaintiff's copyrighted works and distributing those works to coconspirators by and through the BitTorrent file transfer protocol in anticipation of receiving other infringing copies of copyright protected works in exchange.

83. The Defendants' conspiracy with others to unlawfully reproduce and distribute infringing copies of its works by and through the BitTorrent file transfer protocol caused Plaintiff harm in an amount to be determined at trial.

84. Each Defendant is jointly and severally liable for the harm Plaintiff suffered as a result of the Defendants participation in the conspiracy to violate copyright laws.

85. Furthermore, Tabora profited from this contributory infringement by granting Whetstone access to his internet connection for (on information and belief) profit either in the form of goodwill, barter, or a contribution to the bill for the internet connection.

86. Tabora had the right and ability to control Whetstone's access to the internet connection and declined to exercise that right and ability in order to stop Whetstone's activities, even though he was fully aware of the fact that Whetstone used the internet connection regularly to infringe upon the Plaintiff's copyrights and the copyrights of other parties.

87. Both Tabora and Whetstone had the right and ability to control others access to the pirated works in their torrent shared folders.

88. Instead of merely stealing the Plaintiff's work for their own consumption, the Defendants instead made the conscious decision to republish and redistribute the Motion Picture.

### IX.  FOURTH CAUSE OF ACTION
### (Negligence – Against Defendant Tabora)

89. Plaintiff re-alleges and incorporates by reference the allegations contained in each paragraph above.

90. Defendant Tabora's negligent actions allowed Whetstone to unlawfully copy and share Plaintiff's copyrighted Motion Picture, proximately causing financial harm to Plaintiff and unlawfully interfering with Plaintiff's exclusive rights in the Motion Picture.

91. Tabora was aware that Whetstone used Tabora's Internet connection to illegally download and upload copyrighted materials.

92. Defendant Tabora admitted that he not only was aware of Whetstone's illegal activity, but that he informed Whetstone of the likelihood that Tabora and Whetstone might get caught and suffer legal consequences if Whetstone continued his unlawful actions while using Tabora's Internet connection.

93. At one point, according to Tabora, Tabora informed Whetstone that if Whetstone continued his illegal activities, then it would be appropriate for Whetstone to become the party responsible for the apartment's Internet connection.

94. Notably, Tabora's concern was only to protect himself. He did not display the integrity to take the position that Whetstone should cease his wholesale theft out of concern for the fact that his actions were illegal, unethical, and likely to harm the pecuniary interests of copyright owners.

95. Despite his full knowledge of Whetstone's activity and the illegal nature thereof, Tabora declined to terminate Whetstone's access to Tabora's Internet connection.

96. Internet subscribers have a duty to prevent others from using their own Internet connections for illegal purposes.

97. Tabora had a general duty to prevent others from using his Internet connection for illegal purposes.

98. Once Tabora learned that Whetstone was using his Internet connection for wholesale copyright infringement, Tabora had a specific and heightened duty to prevent Whetstone from using his Internet connection for illegal purposes.

99. This heightened duty was higher still since, on information and belief, Tabora had knowledge that Whetstone was infringing upon the Plaintiff's copyrights.

100. Tabora breached his general and specific duties by failing to supervise Whetstone's use of his Internet connection. Upon gaining actual knowledge of Whetstone's illegal activity, Tabora further violated his duty.

101. Tabora's breach of his duty caused the Plaintiff to incur damages. Had Tabora stopped allowing Whetstone to use his Internet connection for illegal purposes, the Plaintiff's copyright would not have been infringed upon.

102. Tabora's failure to adhere to his duty was the cause of the Plaintiff's damages.

103. Plaintiff has incurred damages at an amount to be shown at trial.

**PLAINTIFF'S REQUEST FOR RELIEF**

1. For an injunction providing:

> Defendant shall be and hereby is enjoined from directly or indirectly infringing upon the Plaintiff's copyrights in the Motion Picture or any other works, whether now in existence or later created, that are owned or controlled by Plaintiff (or any parent, subsidiary, or affiliate of Plaintiff), including without limitation by using the Internet or any online media distribution system to reproduce (i.e., download) any of Plaintiff's works, to distribute (i.e., upload) any of Plaintiff's works, or to make any of Plaintiff's works available for distribution to the public, except pursuant to a lawful license or with the Plaintiff's express consent. Defendant also shall destroy all copies of Plaintiff's works that Defendant has downloaded onto any computer hard drive or server and shall destroy all copies of those downloaded works transferred onto any physical medium or device in Defendant's possession, custody, or control.

2. For damages for each infringement of each copyrighted work pursuant to 17 U.S.C. § 504. These damages may be actual or statutory, but if statutory damages are elected, the Defendants' acts were willful in nature, justifying an award of up to $150,000 per infringement, and Plaintiff reserves the right to make such an election.

3. For Plaintiff's costs in this action.

4. For Plaintiff's attorneys' fees incurred in bringing this action.

5. For such other and further relief, either at law or in equity, general or special, to which the may be entitled.

Date: July 19, 2011.

                                               s/ Marc Randazza
Marc Randazza
CA BAR No. 269535
Randazza Legal Group
10620 Southern Highlands Pkwy #110-454
Las Vegas, NV 89141
888-667-1113
305-437-7662 (fax)
MJR@randazza.com