Marc Randazza, SBN 269535
RANDAZZA LEGAL GROUP
6525 Warm Springs Road, Suite 100
Las Vegas, NV 89118
888-667-1113
305-437-7662 (fax)
MJR@Randazza.com

Attorney for Plaintiff,
LIBERTY MEDIA HOLDINGS, LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA, SAN DIEGO DIVISION

| | |
|---|---|
| LIBERTY MEDIA HOLDINGS, LLC<br><br>Plaintiff,<br><br>vs.<br><br>CARY TABORA and SCHULYER WHETSTONE<br><br>Defendants | Case No. 11-CV-651-IEG-JMA<br><br>**SECOND AMENDED COMPLAINT**<br><br>**(1) DIRECT COPYRIGHT INFRINGEMENT – 17 U.S.C. § 501**<br>**(2) CONTRIBUTORY COPYRIGHT INFRINGEMENT**<br>**(3) NEGLIGENCE** |

Plaintiff, Liberty Media Holdings (hereinafter "Liberty" or the "Plaintiff") files this amended complaint against Cary Tabora and Schulyer Whetstone for copyright infringement. This Amended Complaint is filed with the Court's express authority, granted on Oct. 4, 2011 (ECF 17).

**I. INTRODUCTION**

1. Plaintiff is the registered owner of the copyright to a motion picture, "Corbin Fisher's Down on the Farm" (hereinafter the "Motion Picture"). See ECF 1-1.

2. This is a copyright infringement case in which the Defendants were part of a scheme to illegally pirate the Plaintiff's Motion Picture by using BitTorrent file transfer protocol.

3. Plaintiff's original complaint initially named Cary Tabora (hereinafter "Tabora") as a defendant. After a period of time in which Tabora evaded service, the Plaintiff was able to track him down and effect service.

4. Once Tabora was served with the complaint, he contacted counsel for the Plaintiff. During a series of phone between Tabora and Plaintiff's counsel, Tabora claimed that his roommate, identified as Schulyer Whetstone (hereinafter "Whetstone"), was the party who illegally downloaded and subsequently distributed the Motion Picture. Tabora has refused to provide this statement under oath. Nevertheless, Tabora's claims raise a good faith belief that Whetstone is a proper Defendant in this case.[1]

5. In the process of attempting to throw Whetstone under the bus in order to divert attention from himself, Tabora admitted that he had full knowledge that Whetstone regularly used Tabora's Internet connection for the illegal purpose of pirating copyrighted content, yet Tabora continued to permit Whetstone to use his Internet connection for these illegal purposes. See supporting Declaration of Marc Randazza (hereinafter "Randazza Decl.") ¶¶ 4-5. In fact, Tabora stated emphatically, "I was negligent" in allowing Whetstone to use his Internet connection, given the fact that Tabora was aware of Whetstone's illegal conduct. Randazza Decl. ¶ 6. Further, Tabora stated that he was aware that Mr. Whetstone was using his Internet connection to illegally pirate content, and that he was aware that it would eventually cause legal problems for him. Randazza Decl. ¶ 5, 7.

6. Tabora's statements clearly demonstrate that he knew of Whetstone's activities, he knew they were illegal, he had the right and ability to control Whetstone's actions, and he declined to exercise that right and ability. Tabora's statements establish that he saw a duty, saw that he breached that duty, and that he knew both of the duty and of the breach therein.

7. On information and belief, Tabora is not a mere passive participant in Whetstone's piracy activities. On Tabora's information and Plaintiff's belief, Whetstone and

---

[1] If Tabora was not being truthful, he should be subject to sanctions and attorney's fees incurred as a result of his dishonesty. If he is shown to have been truthful, then the Plaintiff will amend this Complaint to remove Tabora from Count I of this Amended Complaint.

Tabora collaborated and conspired in order to achieve the infringement giving rise to the complaint.

8. Plaintiff seeks redress for the Defendants' infringement of its exclusive rights in the Motion Picture, for injunctive relief to stop Defendants from continuing to infringe upon Plaintiff's copyrighted works, and for compensation for Tabora's negligence.

## II.  JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over Plaintiff's claims for copyright infringement and related claims pursuant to 17 U.S.C. §§ 101, et. seq., and 28 U.S.C. §§ 1331 and 1338(a).

10. This Court has personal jurisdiction over the defendants under the California long-arm statute, Cal. Civ. Pro. § 410.10.

11. Defendant Tabora was a subscriber to the Plaintiff's Corbinfisher.com website from October 27, 2008 until October 17, 2010. See ECF 11 at ¶ 5. When Tabora subscribed to the site, Tabora agreed that jurisdiction and venue for any disputes between himself and the Plaintiff was proper in the Southern District of California. ECF 10-12. This exhibits actual knowledge that the Plaintiff is in San Diego and thus, actual knowledge that any conduct that would affect the Plaintiff would be felt in San Diego.

12. During his membership to the Plaintiff's website, Tabora downloaded 144 videos all of which clearly showed that the Plaintiff's location was in San Diego, CA. See ECF 15 at ¶ 6. Therefore, Tabora had further actual knowledge that the Plaintiff was a California based company and that all harm caused to the company would be felt in California.

13. Further still, the Motion Picture at issue in this case displays the location of the copyright owner as being located in San Diego. This is displayed both in the statement of compliance with 18 U.S.C. § 2257. See **Exhibit 1**.

14. The DVD at issue in this case clearly states in its title screen, that it is produced by a California company. See Declaration of Erika Dillon ("Dillon Decl.") at ¶ 5-6; **Exhibit 1**. The Defendants must have known that the DVD originated with a California company.

15. The Defendants knew that the DVD they pirated was the Plaintiff's copyrighted work, as the DVD clearly states this. See Dillon Decl. at ¶ 5-6; **Exhibit 1**. Defendants knew that

the Plaintiff was a California resident, that the work was produced by a California resident, and thus, any harm from the illegal distribution of the DVD would be felt in California.

16. In committing video piracy of this film, the Defendants expressly aimed their unlawful actions at a known forum resident. Any claim that their conduct was caused elsewhere would be sanctionably false. There is no other place where the harm could have been felt.

17. Defendants are properly subject to jurisdiction in this Court because they committed an intentional tort (namely willful copyright infringement), specifically aimed at the Plaintiff, which they knew was located in this jurisdiction; the Defendants expressly aimed their unlawful and harmful conduct at this jurisdiction.

18. Furthermore, on information and belief, the Defendants have infringed upon many additional original works of intellectual property, the majority of which are owned by California entities, and a number of them belonging to Plaintiff.

19. The Defendants' actual or constructive knowledge that the harm suffered by their intentional acts of copyright infringement would be felt in California is supported by the fact that each of the Plaintiff's motion pictures, including the Motion Picture at issue in this case, clearly discloses on its introductory title screen that the work is produced by a San Diego business. See **Exhibit 1**; ECF 15 at ¶ 6.

20. The Defendants engaged in an intentional tort (copyright infringement) committed against a California company, where the infringed upon material clearly stated that the Plaintiff was a California entity, therefore, Defendants knew full well that infringement upon the copyright in the Motion Picture would cause harm and damage in California.

21. On information and belief, Tabora was aware of, endorsed, and benefitted from Whetstone's infringement, and as the individual in control of the Internet connection, he had a right and ability to control Whetstone's infringing activities.

22. Tabora was aware of the fact that Whetstone used Tabora's Internet connection to infringe upon the Plaintiff's copyrights (as well as the copyrights owned by many other California entities and/or residents), and Tabora knew that the Plaintiff was a San Diego based company.

23. On information and belief, Tabora directly participated in the infringement upon the Plaintiff's copyright in the DVD. If Tabora's unsworn statement that Whetstone committed the direct infringement is proven true, then Tabora is nevertheless subject to jurisdiction in this court, as he unknowingly participated in, facilitated, aided, and abetted Whetstone's actions, with the actual or constructive knowledge that the harm therefore would be felt in San Diego.

24. Therefore, even if Tabora were not a subscriber to the Plaintiff's website, and even if Tabora had not agreed to jurisdiction in this district, he would be subject to jurisdiction in this district under the California Long Arm statute as Tabora purposefully directed his activities toward the California intellectual property at issue and a known forum resident. To any extent that he did not do so (as he claims), as a contributory infringer, he would stand in the shoes of the direct infringer.

25. Plaintiff's claims arise out of the Defendants' conduct which gives rise to personal jurisdiction over Defendants. By taking the affirmative act of both illegally downloading and illegally uploading and distributing a known California company's intellectual property, which was clearly labeled as such, Defendants engaged in intentional acts aimed at this jurisdiction. As the Defendants knew or should have known (and only could not have known through willful blindness) that the copyright they infringed upon was California intellectual property, the Defendants expressly aimed their acts at a California company.

26. The Defendants further illegally distributed copies of the Plaintiff's copyrighted motion picture and at least 136 California residents received the Motion Picture from the torrent swarm in which Tabora participated. See Dillon Decl. ¶8 and **Exhibit 2**. In doing so, they committed additional acts, expressly aiming their conduct at this state. A significant number of individuals (136) to whom the Defendants illegally transmitted or re-transmitted the Plaintiff's works were in California. As publicly accessible databases permit relatively accurate geo-location of Internet Protocol ("IP") addresses, Defendants had actual or constructive knowledge that they were transmitting and distributing the Plaintiff's copyrighted intellectual property to 136 California residents. For this reason, even if the Plaintiff were not clearly in California at the time of the infringement, the Defendants would be subject to jurisdiction here because they

provided pirated copies of the Plaintiff's DVD to at least 136 residents of the state, and knew or should have known that they were doing so.

27. As a result, Plaintiff lost at least 136 actual sales in this state's market, but likely far more.

28. There was foreseeable harm in this jurisdiction, and the Defendants' conduct caused harm that they knew or should have known was likely to be suffered in this jurisdiction.

29. It was a foreseeable consequence of the Defendants' actions that the Plaintiff would suffer harm to its profits, business reputation, and goodwill, and it was foreseeable that these harms would be felt in this jurisdiction and venue, as the Defendants knew the Plaintiff was here, the pirated film showed that the Plaintiff was here, and they illegally distributed the film to at least 136 California residents.

30. As a result of the Defendant's apparent transient status between Florida and New York, no other jurisdiction is appropriate for the resolution of this dispute.

### III.  THE PARTIES

#### A.  The Plaintiff, Liberty Media Holdings, LLC

31. Liberty is a California LLC with a mailing address of 302 Washington Street, Suite 321, San Diego, CA 92103.

32. Liberty produces high-quality, adult-themed motion pictures, which it sells to adults only.

#### B. Defendants Schulyer Whetstone and Cary Tabora

33. On information provided by Mr. Tabora (and belief), Defendants are roommates, who at the time of the infringement resided together within the same household.

34. However, Tabora is a Florida permanent resident, as his drivers' license lists a Davie, Florida address, his voter registration lists a Davie, Florida address, and all indications are that Tabora is only in New York temporarily while working toward a masters' degree at Columbia University.

35. According to voter registration records, Whetstone's permanent residence is in Gainesville, Florida. According to driver's license records, Mr. Whetstone's permanent address is in Port St. Lucie, Florida. His actual permanent address is unknown.

36. Defendants used the I.P. address 68.175.79.147 on November 16, 2010 at 7:47:02 a.m. (UTC) to illegally republish and illegally distribute copies of the Plaintiff's copyrighted work, "Down on the Farm," to at least 840 other individuals over the Internet, causing at least $50,400 in actual damages to the Plaintiff.[2]

## IV.  COPYRIGHT AND BITTORRENT

37. BitTorrent is a peer-to-peer file sharing protocol used for distributing and sharing data on the Internet, including files containing digital versions of motion pictures. Rather than downloading a file from a single source, the BitTorrent protocol allows users to join a "swarm," or group, of hosts to download and upload from each other simultaneously. The process works as follows:

   a. First, users download a torrent file onto their computer. This file contains a unique hash code known as the SHA-1 hash – which is a unique identifier generated by a mathematical algorithm developed by the National Security Agency. This torrent file contains a "roadmap" to the IP addresses of other users who are sharing the media file identified by the unique hash value, as well as specifics about the media file. The media file could be any large file, such as a digital motion picture or music file.

   b. Second, the user opens the torrent file with a BitTorrent program, also known as a BitTorrent "client" application, which is capable of reading the roadmap encoded in the torrent file. This client program, after reading the roadmap, connects "uploaders" of the file (i.e. those that are distributing the content) with "downloaders" of the file (i.e. those that are copying the content). During this process, the client reaches out to one or more "trackers" that are identified on the roadmap. A tracker is an Internet server application that records the IP addresses associated with users who are currently sharing any

---

[2] It is important to note that this number is only the first stage of investigation. Hundreds or thousands more pirated copies likely proliferated from the 840 copies, causing potentially millions of dollars in lost sales.

number of media files identified by their unique hash values and then directs a BitTorrent user's computer to other users who have the particular file each user is seeking to download.

38. For a BitTorrent user, this process is quite simple. When a BitTorrent user seeks to download a motion picture, he or she merely opens the appropriate torrent file, which may be found online on any number of torrent search engine websites, using a BitTorrent client application.

39. Because BitTorrent client software generally lacks the ability to search for torrents, end-users use search engines or other websites that contain indices of torrent files to find files being made available by other BitTorrent users. These torrent files do not contain audio or visual media, but instruct the user's BitTorrent client where to go and how to obtain the desired file.

40. The downloading user's BitTorrent client then extracts a list containing one or more tracker locations, which it then uses to connect to at least one tracker that will identify IP addresses where the file is available. Each IP address identifies an uploading user who is currently running a BitTorrent client on his or her computer and who is currently offering the desired motion picture file for download. The downloading user's BitTorrent software then begins downloading the motion picture file without any further effort from the user, by communicating with the BitTorrent client programs running on the uploading users' computers.

41. The life cycle of a file shared using BitTorrent begins with just one individual – the initial propagator, sometimes called a "seed" user or "seeder." The initial propagator intentionally elects to share a file with a torrent swarm. The original file, in this case, contains Plaintiff's entire copyrighted work.

42. Other members of the swarm connect to the seed to download the file, wherein the download creates an exact digital copy of Plaintiff's copyrighted work on the downloaders' computers. As additional thieves request the same file, each additional thief joins the collective swarm, and each new thief receives the same or different pieces of the file from each other thief in the swarm who has already downloaded any part of the file. Eventually, once the initial propagator has distributed each piece of the file to at least one other thief, so that together the

pieces downloaded by members of the swarm comprise the whole motion picture when reassembled, the initial propagator may leave the swarm, and the remaining thieves can still obtain a full copy of the motion picture by exchanging the pieces of the motion picture that each one has.

43. Files downloaded in this method are received in hundreds or even thousands of individual pieces. Each piece that is downloaded is immediately thereafter made available for distribution to other users seeking the same complete file. The effect of this technology makes every downloader also an uploader of the content. This means that every user who has a copy of the infringing material in a swarm may also be a source for later downloaders of that material.

44. In the BitTorrent world, there is honor among thieves. Those who merely download files, without publishing and sharing files, are derisively called "leechers."

45. Being a leecher is not only a negative due to the pejorative terminology, but leechers are also punished by the torrent swarm.

46. BitTorrent's protocol stalls the downloads of leechers, in an effort to preserve network speed for the more prolific copyright infringers. The sharing of files as users receive them, then, is inherent in BitTorrent's use for the protocol to be of any utility to the end user.

47. Whereas the trite maxim says "sharing is caring," in the BitTorrent world, "sharing is currency."

48. This distributed nature of BitTorrent leads to a rapid viral sharing of a file throughout the collective peer users. As more peers join the collective swarm, the frequency of successful downloads also increases. Because of the nature of BitTorrent protocol, any seed peer that has downloaded a file prior to the time that a subsequent peer downloads the same file is automatically a source for the subsequent peer, so long as that first peer is online at the time the subsequent peer requests download of the file from the swarm. Because of the nature of the collective swarm downloads as articulated above, every infringer is – and by necessity together – simultaneously both stealing the Plaintiff's copyrighted material and redistributing it.

49. Plaintiff recorded Tabora's IP address being used to publish and redistribute the Motion Picture via BitTorrent. Therefore, Tabora, Whetstone, or both were not leechers. The Defendants were "seeders" and received a benefit from doing so. This benefit was not in actual

cash, but had serious pecuniary value. The benefit was access to volumes upon volumes of stolen pornographic materials. "Sharing is currency" in the online swap meet of stolen works.

50. Whetstone and Tabora were early participants in this swarm. This particular hash file has been traced to at least 840 infringements which likely spawned thousands more duplicate copies propagated over the Internet. Dillon Decl. ¶ 8. Accordingly, the Defendants' actions were not mere copyright infringement on an individual scale, but were the cause of thousands upon thousands of lost sales and pirated copies of the Plaintiff's work being distributed worldwide.

51. Each of Plaintiff's works is marked with Plaintiff's trademark (CORBIN FISHER®), a copyright notice, a warning that unauthorized copying is illegal and will be prosecuted, and a statement as required by 18 U.S.C. § 2257 that age verification records for all individuals appearing in the works are maintained at corporate offices in San Diego, California.

## V. FIRST CAUSE OF ACTION
### (Direct Copyright Infringement 17 U.S.C. § 501 – Against Defendants Whetstone and/or Tabora)

52. The Plaintiff re-alleges and incorporates by reference the allegations contained in each paragraph above.

53. All evidence currently points to Tabora as the direct infringer. However, he has made statements that Mr. Whetstone committed the infringement. Plaintiff reserves the right to amend this complaint to delete either individual as the direct infringer if Tabora's statements are shown to be provably true or provably false.

54. Defendants, without authorization, copied and distributed audiovisual works owned by and registered to Plaintiff in violation of 17 U.S.C. §§ 106(1) and (3).

55. Plaintiff is, and at all relevant times has been, the copyright owner of the copyrighted work infringed upon by all Defendants, "Down on the Farm." See ECF 1-1.

56. Among the exclusive rights granted to Plaintiff under the Copyright Act are the exclusive rights to reproduce the Motion Picture and to distribute it – rights which Defendants maliciously and intentionally infringed upon, and did so for profit.

57. Plaintiff is informed and believes, and on that basis alleges, that one of the Defendants without the permission or consent of Plaintiff, used, and continues to use the

BitTorrent file transfer protocol to distribute the Motion Picture to the public, and/or make the Motion Picture available for distribution to others, including other BitTorrent users. In doing so, Defendant has violated Plaintiff's exclusive rights of reproduction and distribution. Defendant's actions constitute infringement of Plaintiff's copyrights and exclusive rights under the Copyright Act.

58. Plaintiff is informed and believes and on that basis alleges that the foregoing acts of infringement were willful and intentional.

59. As a result of Defendant's infringement of Plaintiff's copyrights and exclusive rights under the Copyright Act, Plaintiff is entitled to either actual or statutory damages pursuant to 17 U.S.C. § 504(c), and to its attorney's fees pursuant to 17 U.S.C. § 505.

60. The conduct of Defendant is causing and will continue to cause Plaintiff great and irreparable injury. Such harm will continue unless the Defendant is enjoined from such conduct by this Honorable Court. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting Defendant from further infringing Plaintiff's copyrights, and ordering Defendant to destroy all copies of the Motion Picture made in violation of Plaintiff's exclusive rights under the Copyright Act.

### VI.  SECOND CAUSE OF ACTION
### (Contributory Copyright Infringement –
### Against Defendants Whetstone and/or Tabora)

61. Plaintiff re-alleges and incorporates by reference the allegations contained in each paragraph above.

62. It is helpful to think of the process of "torrenting" in the context of a constructed puzzle. In furtherance of sharing this puzzle, it is deconstructed into tiny pieces. These pieces are then uploaded and distributed among one or more peers. When an infringer seeks to download the original file, he downloads a torrent file containing information concerning where each of the distributed pieces of the file can be found, i.e., how to find and contact each peer. Each torrent file that contains information about where the same original file is contains the same "hash" value, which is a string of letters and numbers that uniquely identifies the original file that the torrent file may be used to locate and download. This torrent file is capable of locating all the unique corresponding pieces that make up the original file (and any additional copies of

each piece that may be available). Once all the pieces are located and downloaded they are reconstructed back into the original order completing the entire original copyrighted file.

63. When users all possess the same infringing work with the same exact hash value (as in this case), it is because each infringer possesses an <u>exact</u> digital copy, containing the exact bits unique to that file, of the original work. In essence, although hundred of users may be uploading the copyrighted work, you will receive only the exact parts of a singular upload, not a compilation of available pieces from various uploads.

64. The Defendants published the Plaintiff's copyrighted motion picture to the BitTorrent network.

65. BitTorrent users upload infringing works in concert in order to gain access and ability to download other infringing copyrighted works.

66. The Defendants knew of the infringement, were conscious of their own infringement, and the Defendants were conscious of the fact that multiple other persons downloaded the file containing the Plaintiff's Motion Picture, and that they would, in turn, redistribute the Motion Picture.

67. The infringement by other BitTorrent users could not have occurred but for the Defendant's participation in uploading the Plaintiff's protected work. As such, the Defendants' participation in the infringing activities of others is substantial, was certain to harm the Plaintiff, and continues to this day.

68. The Defendants each profited from this contributory infringement by way of being granted access to a greater library of other infringing works, some of which belonged to the Plaintiff and some of which belonged to other copyright owners.

69. In the event that Tabora's attempt to blame Whetstone for the infringement was based in truth, Tabora profited from this contributory infringement by granting Whetstone access to his Internet connection for (on information and belief) profit either in the form of goodwill, barter, or a contribution to the bill for the Internet connection.

70. Tabora had the right and ability to control Whetstone's access to the Internet connection and declined to exercise that right and ability in order to stop Whetstone's activities,

even though he was fully aware of the fact that Whetstone used the Internet connection regularly to infringe upon the Plaintiff's copyrights and the copyrights of other parties.

71. Tabora knew of the infringement, was conscious of Whetstone's infringing activities, and the infringement by Whetstone and other BitTorrent users could not have occurred but for Tabora's contribution to the scheme and his profit therefrom. Furthermore, the Defendants had the right and ability to control other members of the Torrent swarm from accessing his computer.

72. Defendant chose not to exercise this right and ability to control this access because allowing greater access to his library of stolen works gave him greater access to other's libraries of stolen works.

73. Defendant declined to exercise the right and ability to control other's access to his library of stolen works for profit and that profit was in the form of greater access to other stolen works.

74. As such, Defendant Tabora is liable for the immediate contributory infringement of his roommate, Schulyer Whetstone. Additionally, Whetstone and/or Tabora are liable for the infringement of all members of the torrent swarm who came after them.

## VII.  THIRD CAUSE OF ACTION
### (Negligence – Against Defendant Tabora)

75. Plaintiff re-alleges and incorporates by reference the allegations contained in each paragraph above.

76. This cause of action is pled in the alternative. In the event that Tabora has been truthful, that the true infringer is Mr. Whetstone, then Tabora was negligent and his negligence caused actual damages to the Plaintiff in the form of lost sales.

77. Defendant Tabora's negligent actions allowed Whetstone and others to unlawfully copy and distribute Plaintiff's copyrighted Motion Picture, proximately causing financial harm to Plaintiff.

78. Tabora was aware that Whetstone used Tabora's Internet connection to steal and redistribute the Plaintiff's intellectual property. In doing so, Tabora negligently caused harm to the Plaintiff in the form of lost sales and reputational damage.

79. Defendant Tabora admitted that he not only was aware of Whetstone's illegal activity, but that he informed Whetstone of the likelihood that Defendants might get caught and suffer legal consequences if Whetstone continued his unlawful actions while using Tabora's Internet connection. Randazza Decl. ¶ 7.

80. At one point, according to Tabora, Tabora informed Whetstone that if Whetstone continued his illegal activities, then it would be appropriate for Whetstone to become the party responsible for the apartment's Internet connection. Randazza Decl. ¶ 7. If true, this shows that Tabora was well aware of the fact that Whetstone was committing a legal harm.

81. Notably, Tabora's concern was only to protect himself. He did not display the integrity to take the position that Whetstone should cease his wholesale theft out of concern for the fact that his actions were illegal, unethical, and likely to harm the Plaintiff's business, which he knew of, knew would suffer harm, and which he knew would suffer harm in the state of California.

82. Despite his full knowledge of Whetstone's activity and the illegal nature thereof, Tabora declined to terminate Whetstone's access to Tabora's Internet connection.

83. Internet subscribers have a duty to prevent others from using their own Internet connections for illegal purposes. This duty is heightened when the subscriber has actual knowledge that others are using their connection for illegal purposes.

84. Tabora had a general duty to prevent others from using his Internet connection for illegal purposes.

85. Once Tabora learned that Whetstone was using his Internet connection for wholesale, unlicensed distribution of the Plaintiff's works, Tabora had a specific and heightened duty to prevent Whetstone from using his Internet connection for illegal purposes.

86. This heightened duty was higher still since, on information and belief, Tabora had knowledge that Whetstone was causing damage to the Plaintiff.

87. Tabora breached his general and specific duties by failing to supervise Whetstone's use of his Internet connection. Upon gaining actual knowledge of Whetstone's illegal activity, Tabora further violated his duty.

88. Tabora's breach of his duty caused the Plaintiff to incur damages. Had Tabora stopped allowing Whetstone to use his Internet connection for illegal purposes, the Plaintiff would not have lost sales. As a result of Tabora's negligence, the Plaintiff lost at least 840 total sales, at $60 per sale.

89. Tabora's failure to adhere to his duty was the cause of actual damages to the Plaintiff. These damages are not copyright damages, but are lost sales and reputational harm to the Plaintiff in an amount to be proven at trial.

90. Plaintiff has incurred damages at an amount to be shown at trial.

## PLAINTIFF'S REQUEST FOR RELIEF

1. For an injunction providing:

Defendant shall be and hereby is enjoined from directly or indirectly infringing upon the Plaintiff's copyrights in the Motion Picture or any other works, whether now in existence or later created, that are owned or controlled by Plaintiff (or any parent, subsidiary, or affiliate of Plaintiff), including without limitation by using the Internet or any online media distribution system to reproduce (i.e., download) any of Plaintiff's works, to distribute (i.e., upload) any of Plaintiff's works, or to make any of Plaintiff's works available for distribution to the public, except pursuant to a lawful license or with the Plaintiff's express consent. Defendant also shall destroy all copies of Plaintiff's works that Defendant has downloaded onto any computer hard drive or server and shall destroy all copies of those downloaded works transferred onto any physical medium or device in Defendant's possession, custody, or control.

2. For damages for each infringement of each copyrighted work pursuant to 17 U.S.C. § 504. These damages may be actual or statutory, but if statutory damages are elected, the Defendants' acts were willful in nature, justifying an award of up to $150,000 per infringement, and Plaintiff reserves the right to make such an election.

3. For damages of not fewer than 840 lost sales, incurred due to Tabora's negligence, as pled in the Third Cause of Action, for a total of $50,400 in damages from Tabora's negligence.

4. For Plaintiff's costs in this action.

5. For Plaintiff's attorneys' fees incurred in bringing this action.

6. For such other and further relief, either at law or in equity, general or special, to which the Plaintiff may be entitled.

Date: October 21, 2011.                    *s/ Marc Randazza*
                                           Marc Randazza, SBN269535
                                           Randazza Legal Group
                                           6525 Warm Springs Road, Suite 100
                                           Las Vegas, NV 89118
                                           888-667-1113
                                           305-437-7662 (fax)
                                           MJR@randazza.com